UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

ESTATE OF RYAN L. CLARK,

              Plaintiff,

       v.                            Case No.  14-C-1402

COUNTY OF GREEN LAKE,
CORRECTIONAL HEALTHCARE COMPANIES INC.,
HEALTH PROFESSIONALS LTD.,
TINA KUEHN, BRUCE WALKER,
STEVEN SCHONSCHECK,

              Defendants.

ORDER DENYING BRUCE WALKER'S MOTION FOR SUMMARY
JUDGMENT (DOC. 42),  GRANTING STEVEN SCHONSCHECK'S MOTION FOR
SUMMARY JUDGMENT (DOC. 42), DENYING TINA KUEHN'S MOTION FOR
SUMMARY JUDGMENT (DOC. 70), GRANTING CORRECTIONAL HEALTHCARE
COMPANIES INC. AND HEALTH PROFESSIONALS LTD.'S MOTION FOR
SUMMARY JUDGMENT (DOC. 70), AND SETTING STATUS CONFERENCE

      The Estate of Ryan Clark filed this lawsuit after Ryan Clark committed suicide while

incarcerated in the Green Lake County Jail ("Jail").  Defendants Green Lake County, Bruce

Walker, Liz Pflum, and Stephen Schonscheck ("Green Lake defendants") filed a motion to

dismiss, or in the alternative, for summary judgment on the basis of qualified immunity.

Then, plaintiff moved to amend the complaint for the purpose of adding a *Monell* claim

against County of Green Lake and removing Pflum as a defendant.[1]  (Doc. 48.)  The court

granted the motion to amend but denied the Green Lake defendants' motion to dismiss

after concluding that disposition of the motion required consideration of the depositions and

declarations on file.   Months later, the corporate health care providers, Correctional

---

[1]Plaintiff's brief in opposition to the summary judgment motion clarified that plaintiff had no objection
to dismissing Pflum, and Pflum was not named as a defendant in the amended complaint.  (Docs. 61 at 3;
76.)  Further, the court granted the parties' motion to dismiss Pflum as a defendant at the evidentiary hearing.

Healthcare Companies, Inc. ("CHC"), and Health Professionals Ltd. ("HPL"), and their employee, Tina Kuehn, filed their motion for summary judgment. Consequently, the court must now decide whether Walker and Schonscheck have met their burden of establishing as a matter of law that they were not deliberately indifferent to Clark's medical needs and that Clark had no clearly established right to different treatment. Additionally, the court must decide whether the defense of qualified immunity extends to Kuehn, a nurse who was employed by a corporate health provider, and whether the plaintiff may proceed on a respondeat superior claim or a *Monell* claim against CHC and HPL. For the reasons set forth below, the motions will be granted as to Schonscheck, CHC, and HPL, but genuine issues of material fact preclude summary judgment for Walker and Kuehn.

Motions for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir.1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322. In determining whether to grant a motion for summary judgment, the court should consider the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. When the record, taken as a whole, could not lead a rational jury to find for the non-moving party, there is no genuine issue and no reason to go to trial.

2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Further, once qualified immunity is raised by a defendant, it becomes the plaintiff's burden to defeat it. *See Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008).

FINDINGS OF FACT

For purposes of summary judgment, the court has reviewed all proposed findings to make sure they are in compliance with the Federal and Local Rules and are supported by citations to the record. Also, it has disregarded proposed findings that were not set forth in short numbered paragraphs, or that were otherwise not supported by an affidavit or declaration made with personal knowledge. Fed. R. Civ. P. 56(c)(4); Civil L.R. 56(b)(1)(C)(i)-(iii). Moreover, the court notes that defendants' *Daubert* objections were not supported by a motion or argument and, therefore, should not be considered at this time.

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the plaintiff, the Estate of Ryan Clark, has alleged a violation of Clark's constitutional rights pursuant to 42 U.S.C. § 1983 (Doc. 1.) The Eastern District of Wisconsin is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) as the events omissions giving rise to the claim occurred in Green Lake County, Wisconsin. (Doc. 1.) The Estate of Ryan L. Clark, represents the decedent, Ryan L. Clark ("Clark"). The Waushara County Circuit Court appointed Vickie Clark as administrator of Clark's estate. Waushara County Circuit Court Case No. 2012-PR-60.

Defendant Green Lake County is a municipal corporation organized under the laws of the State of Wisconsin. In May of 2012, Bruce Walker worked at the Green Lake County

3

Jail ("the Jail") as a corrections officer, Stephen Schonscheck was a part-time corrections officer, and Liz Pflum was a corrections sergeant. (Doc. 46, Simatic Decl. ¶ 3, Ex. A.)

Green Lake County contracted with HPL to provide healthcare for inmates at the Jail. The term of the contract at issue was July 1, 2011, through December 31, 2012. (Doc. 8, ¶ 10.) However, CHC did not contract to provide mental health services at the Green Lake County Jail:

> 1.11 MENTAL HEALTH - NOT COVERED. HPL shall not be responsible for the provision or cost of any mental health services. The COUNTY shall be responsible for the provision or cost of mental health services for the JAIL POPULATION.

(Elmer Aff. ¶ 5, 4.) HPL was taken over by CHC (Lueptow Dep. 40.), and, for purposes of this suit, it is undisputed that HPL and CHC had common corporate ownership, officers and directors. (Doc. 102, ¶ 4.)

Between December 2011, and October 1, 2012, CHC employed Kuehn as a registered nurse at the Green Lake County Correctional Facility in Green Lake, Wisconsin. (Doc. 8, ¶ 12; Kuehn Dep. Exs. 1 and 3.) Kuehn has been a licensed registered nurse since 2010.[2] Kuehn's position entailed providing a full range of nursing services to inmates including assessing, nursing diagnosis, planning, implementing, and evaluating the medical condition of inmate patients. (Olson Decl. ¶ 5, Kuehn Dep. Ex. 2.) Kuehn testified in her deposition that "officers would let [me] know if there was anything they found to be—as far as like a red flag as mental history. As far as current suicidal ideation or wanting to harm themselves, they would—he or she would let [me] know that they found that on their assessment." (Kuehn Dep. 43.)

---

[2] https://app.wi.gov/LicenseSearch/IndividualLicense/SearchResultsSummary?chid=797183.

On August 15, 2007, Clark was sentenced to eighteen months in state prison followed by three years on extended supervision for his fifth offense of operating under the influence contrary to Wis. Stat. § 346.63(1). (Doc. 46, Simatic Decl. ¶ 6, Ex. D.) Clark finished his term of confinement on February 24, 2009, and was released to extended supervision. (*Id.*) Thereafter, Clark was admitted to the Jail approximately eight times during the next two years as a result of alleged infractions of the rules of his extended supervision. (*Id.*) Each time he was placed on a "hold" by his extended supervision officer as a result of an alleged infraction of the rules of extended supervision that included being under the influence of alcohol. (Doc. 1, ¶ 405.) On June 4, 2009, Clark was perceived by the Jail staff to be suicidal and was placed on Special Watch Observation. (Ward Decl. ¶ 5.) Walker was one of the correctional officers who observed and interacted with Clark while Clark was on Special Watch Observation in 2009. (Doc. 1, ¶ 408.)

In early August of 2011, Clark was perceived to be suicidal during his confinement at the Winnebago County Jail (where he attempted to cut his wrists on the edge of the sink or toilet in his cell) resulting in his being placed on Special Watch there. He was transferred to Green Lake County Jail later that month, and the account of his suicidal conduct was included in his transfer documents. (Doc. 59, Ward Decl. ¶ 6.) Further, during his several admissions to the Jail between February 2009, and August of 2011, Clark was frequently given medications for depression. (Doc. 59, Ward Decl. ¶ 7.) For example, in May and June of 2009, he was prescribed Fluoxetine for his treatment of depression. (Doc. 59, Ward Decl. ¶ 8.) He told the Intake Officer that when he does not take the medication he gets anxiety attacks. (Doc. 59, Ward Decl. ¶ 9.) During his stay at the Jail in August of

5

2010 and in Mach of 2011, Clark was prescribed Sertraline, an antidepressant. (Doc. 59, Ward Decl. ¶¶ 10, 11.)

After Clark's extended supervision was revoked in September of 2011, he returned to prison. (Doc. 46, Simatic Decl. ¶ 6, Ex. D.) On November 29, 2011, Clark was released and began a period of extended supervision. (Doc. 46, Simatic Decl. ¶ 7, Ex. E.) However, on January 12, 2012, he was admitted to the Jail and was required to serve a 60-day sanction for violating provisions of his extended supervision. (Doc. 46, Simatic Decl. ¶ 8, Ex. F.) At that time, Pflum assessed Clark as a maximum suicide risk. (Doc 1, ¶ 418.) On January 27, 2012, Kuehn administered a Health Assessment and determined that Clark was suffering from depression and alcoholism. (Doc. 59, Ward Decl. ¶ 14.) While incarcerated from January to March 23, 2012, Clark was prescribed Trazadone and had seven sessions with the mental health worker as noted in his jail records. (Doc. 59, Ward Decl. ¶¶ 15, 16.)

On May 23, 2012, Clark was again admitted to the Jail for violating the terms of his extended supervision. (Doc. 57, ¶ 16.) A preliminary breath test revealed that he had a blood alcohol level of 0.27, more than three times the legal limit. (Doc. 57, ¶ 17.)

At that time, Green Lake County Sheriff's Office Policy No. 406.2.1 addressed suicide prevention in the Jail (the "Suicide Prevention Policy"). (Doc. 46-8; Doc. 57, ¶ 18.) The Suicide Prevention Policy directs Jail staff to take precautions "to ensure that inmates are properly screened and identified as being a suicide risk." (*Id*.) Intake officers are directed to complete a Spillman Initial Inmate Assessment on each inmate taken into custody to "try to determine if the inmate is, or may be, a suicide risk." (*Id*.) This assessment requires that the intake officer should (1) observe the inmate for any visual

6

indicators associated with possible suicide risk; (2) review any information provided by the arresting officer; (3) review any information from a transferring agency, if applicable; (4) ask the inmate basic questions regarding history of suicide attempts, his or her current state of mind, his or her medical condition; and (5) document any observations, along with the inmate responses to the Spillman Initial Inmate Assessment. (*Id.*)

Additionally, the Suicide Prevention Policy states that "i[f] basic intake indicates that a new inmate may be a suicide risk, an in-depth suicide screening shall be completed to obtain more detailed information about the inmate's situation and to better assess his/her degree of risk." (*Id.*) "[B]ased on the results of the Initial Inmate Assessment, as well as other information about the inmate obtained either formally or informally, an assessment will be made as to the degree of an inmate's suicide risk." (*Id.*) According to the Suicide Prevention Policy, "[a]n inmate's risk assessment shall be considered when determining the inmate's classification and housing placement." (*Id.*) If the inmate is assessed as a suicide risk, then he "shall be placed on "Special Watch" status [in] a Special Needs Cell." (*Id.*) "Special Watch" is defined as a "closer level of observation because of exceptional circumstances" such as a suicidal inmate, and the inmate "shall be observed at staggered intervals, with no more than fifteen (15) minutes between checks." (*Id.*) Hence, the policy and procedure required that when an inmate is perceived to be a potential suicide risk, that inmate be properly housed, monitored, and referred for evaluation by mental health staff. (Doc. 83, Lueptow Dep. 97.)

Walker acted as the Intake Officer on May 23, 2012. (Doc. 46-9.) As part of the intake process, Walker performed a security risk assessment, medical assessment and an initial suicide risk assessment on Clark, consistent with the Suicide Prevention Policy.

7

(Doc. 46-10.)  The medical assessment noted that Clark's behavior did not suggest a risk of suicide, showed no signs of alcohol withdrawal, and no signs of inappropriate or unusual behavior or mental illness.  (Doc. 58, Olson Decl. ¶ 3, Ex. 2, Part Two.)  Walker asked Clark whether he was taking any prescribed medications and Clark responded yes, for depression, but could not remember the medication's name.  (Doc. 46-11, Walker Dep. 33.)  Walker made note of that in the jail record.  (*Id.*)  Clark also told Walker that he was not under a doctor's care and that there were no other medical problems that the Jail needed to know about.  (Doc. 58, Olson Decl. ¶ 3, Ex. 2, Part Two*.)*  Although an intake officer checks previous records to determine whether the inmate has a prior suicidal history while in the Jail (Lueptow Dep. 99:17-25.), Walker did not check Clark's records at the Jail for a suicidal history in that facility.  (Doc. 64, ¶ 31.)

The suicide risk assessment required that Walker enter answers to questions into the Spillman Initial Inmate Assessment, which produces a computerized assessment of suicide risk.  (Doc. 45, Walker Decl. ¶ 5; Doc. 46-11, Walker Dep. 15-16.)  Walker noted: (1) Clark understood his questions; (2) Clark was under the influence of alcohol; (3) Clark had received psychiatric care or been hospitalized in a mental health institution 8-9 years before the date of his incarceration in May 2012; (4) Clark had contemplated or attempted suicide by cutting his arm in 2005 – seven years before his incarceration in May 2012; and (5) Clark's cousin had attempted or committed suicide on an unspecified date.  (Doc. 46-10.) However, Clark told Walker that he was not currently contemplating suicide.  (Doc. 58-2; Doc.. 58-5, 104.)  Walker concluded that Clark was a maximum risk for suicide, and testified  that he believed any inmate who had been drinking would be rated a maximum suicide risk.  (Doc. 46-11, Walker Dep.  22-23, 24.)

8

Pflum testified that the intake procedure was to not use the risk class rating and the final Spillman Suicide Assessment score, but to base the decision as to suicide risk on responses to individual questions. (Doc. 46-12, Pflum Dep. 15, 18, 19, 42.) If an inmate said he was not currently thinking of committing suicide, the inmate would generally not be placed on suicide watch. *Id.* Pflum, as an intake officer, could make a determination contrary to the result of the official suicide assessment, despite having no training in psychology other than some classes and having no additional training in suicide or counseling suicidal people. (Doc. 46-12, Pflum Dep. 36-37.) Jail Administrator De Anne Lueptow said that officers have discretion as to when to put an inmate on suicide precautions, and that the most important factor is if the inmate is stating a present desire and intent to commit suicide, despite the result of the assessment. (Doc. 83, Lueptow Dep. 102-104.)

In any event, the Jail Suicide Prevention policy requires that "Inmates identified as suicide risks will be housed properly, monitored, and evaluated by mental health staff." (Doc. 83, Lueptow Dep. 97.) After performing the security risk assessment, medical assessment, and a suicide risk assessment on Clark, Walker placed Clark in a holding or intake cell in the booking area pending Kuehn's assessment. (Doc. 46-11, Walker Dep. 22-26.) The paperwork, including the Spillman Suicide Risk Assessment, was left for Kuehn. (Doc. 46-11, Walker Dep. 17.)

Clark's holding/observation cell was visible to all officers in the booking room. (Doc. 45, Walker Decl. ¶ 8.) The officer stations in the booking area face the holding cells and the distance between the officers and the cells is approximately fifteen feet. (*Id.*) Ordinarily, the medical staff would determine whether the inmate should be placed in

9

general population, a special needs cell, or referred to an outside facility for treatment. (Doc. 46-2, Kuehn Dep. 16-17.) Walker knew that Jail medical staff would visit Clark in the holding cell and conduct a follow-up evaluation and possible determination of preventative actions. (Doc. 46-11, Walker Dep., 25.) At no time during Clark's incarceration in the Jail from May 23, 2012, to May 28, 2012, did Jail staff place him in a general population cell. (Doc. 46-11, Walker Dep. 59.)

Jail policy required that inmates with a suicide risk be placed on "Special Watch" status in a special needs cell, if one was available. (Doc. 57, ¶ 22.) There are three special needs cells in the Jail – two are for medical special needs and one is a suicide prevention cell. (Doc. 83, Lueptow Dep. 51.) Walker did not order Clark to be housed in a special needs suicide prevention cell or that he be placed on suicide watch. (Doc. 46-11, Walker Dep. 25; Doc. 45, Walker Decl. ¶ 6.) The suicide prevention cell (Special Needs Cell #2) differs from the other two observation cells in that the inmate can be observed more easily along the entire wall facing the Bubble is glass, and there is no privacy wall between the front of the cell and the toilet/shower area. (Doc. 46-11, Schonscheck Dep. 30, 31, 34, 58, 59.) The suicide prevention cell also has no protrusions on the interior from which an inmate can hang himself. (Doc. 46-11, Schonscheck Dep. 34, 58, 59.)

The Master Control Aide sits facing the bank of security camera monitors, with his back to the special needs cells. (Doc. 46-11, Schonscheck Dep. 30.) To observe an inmate in a special needs cell directly (rather than on camera), the Master Control Aide must get up from his chair, turn around, and walk a few steps and look over the railing into the cell. (Doc. 46-11, Schonscheck Dep. 30.) Had Clark been placed on suicide watch, the Master Control Aide would have personally observed Clark by leaving his chair at the video

10

monitor and looking into the cell every 15 minutes and Clark would have been dressed in a suicide gown, or turtle suit, made of material that cannot be ripped and fashioned into a noose. (Doc. 46-11, Schonscheck Dep. 31, 34.)

Shortly after he was assessed by Walker, Clark was seen by Kuehn in the holding cell and given a follow-up health assessment. (Doc. 46-2, Kuehn Dep. 87.) At that time, Kuehn was working a normal business hours shift, approximately 8 a.m. to 4:30 p.m., Monday through Friday. (Doc. 73, Elmer Decl. Ex. 1, Kuehn Dep. 20.) Kuehn had access to the medical assessment and suicide assessment completed by Walker. (Doc. 46-2, Kuehn Dep. 91.) Indeed, she placed the Spillman Suicide Risk Assessment in Clark's medical chart. (Doc. 46-2, Kuehn Dep. 58-59.) Part of Kuehn's employment included training on suicide risk and suicide prevention. (Doc. 46-2, Kuehn Dep. 23; Doc. 81, Short Dep. 71, 73-74.) Kuehn also received training on the CHC Healthcare Policy and Procedures. (Doc. 81, Short Dep. 66, 67.) However, a jail nurse is not a "qualified mental health professional." (Doc. 102, ¶ 82.)

At approximately 12:15 p.m. on May 23rd, Kuehn assessed Clark for alcohol withdrawal and documented her interaction as "Problem Oriented Record." (Doc. 58-2; Doc. 58-5, 106.) In her assessment, Kuehn noted that Clark reported that he had spent the night before drinking an entire bottle of vodka, having his last drink around 9 a.m. that morning. She noted a history of alcohol withdrawal. (*Id.*) The alcohol withdrawal protocol that was followed for Clark was not written for him specifically, but generally for all inmates in alcohol withdrawal. (Doc. 46-2, Kuehn Dep. 121-122.)

After her evaluation, Kuehn assigned Clark to a special needs cell because of his alcohol withdrawal rather than placing him in the suicide prevention special needs cell.

11

(Doc. 46-13, Schonscheck Dep. 55.)   She was aware that Clark was at increased risk for suicide because he was detoxifying from alcohol.  (Doc. 46-2, Kuehn Dep. 7.)  Additionally, Kuehn knew that Clark would be in his cell 24 hours per day, that this was a solitary confinement situation and that he would experience extreme isolation.  (Doc. 46-2, Kuehn Dep. 7, 108-109, 122, 124.)  According to Kuehn, one of the ways of protecting a person withdrawing from alcohol and at greater risk for suicide was placing him in a special needs isolation cell with cameras that are monitored closely by corrections staff.  (Doc. 46-2, Kuehn Dep. 33, 34, 35 and 51.)  However, Lueptow testified that cameras in the special needs cells did not display any more frequently than those in other parts fo the jail unless specifically set to do so.  (Doc. 83, Lueptow Dep. 54, 55.)  In any event, Wisconsin law required that jail staff physically observe inmates, including Clark, irregularly and at least once per hour.  (Doc. 86, ¶ 30.)

Kuehn testified that she had the authority to determine Clark's housing assignment; however, this practice is not in compliance with the Jail's Suicide Prevention Policy which requires the Intake Officer "to determine the appropriate actions to take to ensure the inmate's safety," and requires that an inmate who has been assessed as a suicide risk "shall be placed on 'Special Watch' status in a Special Needs Cell." (Doc. 64, ¶ 34.) Kuehn did **not**:  (1)  refer Clark to mental health after seeing that he had been assessed as a maximum suicide risk on the Spillman Suicide Risk Assessment; (2) place him on suicide watch; or (3) inform the corrections staff at the Jail that Clark was at imminent risk for committing suicide.  (Doc. 46-2, Kuehn Dep. 75, 144.)

On the other hand, the problem oriented record for alcohol withdrawal document indicates that Kuehn saw Clark again in the afternoon of May 23, and twice the next day.

12

(Doc. 58-2; Doc. 58-5,106.) Each time Kuehn noted his vital signs and withdrawal symptoms. (*Id.*) Clark was also administered several medications for alcohol withdrawal. (*Id.*) Kuehn testified that she would have followed up with Clark when she returned to work on Tuesday, May 29th, if he had lived (May 28 was Memorial Day). (Doc. 73-1, Kuehn Dep. 124.)

According to CHC policy, where a patient has a history of mental illness, it is important to obtain accurate information about the medication he has been taking prior to his admission and to get him back on it as quickly as possible for continuity of treatment. This is done by getting the information from the patient, verifying with the pharmacy, and getting a signed release so that the nurse can talk to the doctor [or the pharmacy or family.]" (Doc. 81, Short Dep. 78.) If a nurse has obtained such a release, it would be in the patient's medical record. (Doc. 81, Short Dep. 81.) There was no such release in Clark's medical file for his May 23, 2012, admission. (Doc. 58-4; Doc. 58-5.) A nurse does not have the authority to make the decision whether a medication should be discontinued. (Doc. 81, Short Dep. 57.) Further, a registered nurse is not permitted to prescribe medications without an order from a physician. (Doc. 87, 3; Doc. 81, Short Dep. 44.) Kuehn stated that she did not seek out Clark's antidepressant because antidepressants were not typically allowed during the alcohol protocol and because Clark could not provide the name of a doctor or pharmacy. (Doc. 46-2, Kuehn Dep. 102-105.)

Whenever a jail nurse has contact with a physician by telephone, she memorializes that contact in the record. (Doc. 81, Short Dep. 111.) Cathy Struehl, Kuehn's immediate supervisor, whose job included chart reviews, went over Clark's jail medical record from his May 23, 2012, admission, and admitted that there was no notation of Kuehn ever calling

13

the on-call physician for orders on Clark.  (Doc. 84, Streul Dep. 9, 16, 18, 23-24; Doc. 94-5, Kuehn Dep. Ex. 14.)  Kuehn testified that it was her practice to call for approval but did not remember doing so in this case.  (Doc. 46-2, Kuehn Dep. 133.)

On May 27–28, 2012, Clark remained housed in the special needs cell, Cell 1, due to alcohol withdrawal.  (Doc. 46-2, Kuehn Dep. 107-108; 124.)  There is no evidence that Clark submitted a written request or made a verbal request for medical or mental health care between May 23 and May 28, 2012.  (*See generally* Doc. 58-2; Doc. 58-5.)  On May 27, 2012, Schonscheck was the Master Control Aide on the 6 p.m. to 6 a.m. shift of the Jail in the Control Hub or "Bubble" — a position he had held since September of 2011.  (Doc. 46-9, Ex. I; Doc. 46-13, Schonscheck Dep. 6, 8, 9, 23.)  His duties included observing various areas of the Jail on one of the 32 cameras,  all of which can be seen on monitors in the control room.  (Doc. 46-13, Schonscheck Dep. 18-19.)  During this shift, Clark was not on suicide watch and Schonscheck did not have reason to believe Clark posed a suicide risk.  (Doc. 46-13, Schonscheck Dep. 28; Doc. 44, ¶ 3.)

The Master Control Aide has many duties, including:  (1) remotely opening and closing jail doors to allow officers to move about the facility; (2) monitoring the high risk intake/booking room by video; (3) following on camera officers who are doing security checks in the Jail; and (4) making log entries on all activity in the Jail.  (Doc. 44, ¶ 4.) Monitoring the intake/booking room and officers performing security checks is important for reasons of jail security.  Little may be known about individuals entering the intake/booking room who may be under the influence of drugs or who may be combative, requiring the presence of additional officers.  (Doc. 44, ¶ 5.)

14

There were seven computer monitors in front of the Master Control Aide. The monitor directly in front of Master Control Aide managed the remote opening and closing of doors throughout the Jail. The monitor immediately to the right displayed the security log maintained by the Master Control Aide. The second monitor to the right displayed up to four different camera videos playing at once (a "four-screen monitor"). The monitor furthest to the right had four-screens that always displayed the inmate/booking room. The monitor immediately to the left of the Master Control Aide and second to the left were four-screen monitors, and the monitor furthest to the left was a four-screen monitor that displayed dormitory cameras. The monitor arrangement is illustrated as follows:

| Dorm cameras | | | | | | | | | | Intake/Booking cameras only | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Video | Video | Video | Video | Video | Video | Computer monitor to unlock doors | Security log computer monitor | Video | Video | Video | Video |
| Video | Video | Video | Video | Video | Video | | | Video | Video | Video | Video |

With the three four-screen monitors that could be switched between various cameras, there were an additional 12 quarter screens to monitor. The movements of all officers who were on security checks in the Jail, monitor hallways through the Jail, a safety priority and monitor other cameras throughout the Jail. (Doc. 44, ¶ 8.) The videos on the three four-screen monitors reset periodically and switched between various cameras in the Jail; however, the Master Control Aide had the ability to manually set the screens to view a feed from a particular camera. (Doc. 44, ¶ 9.)

15

On Sunday, May 27, 2012, Schonscheck's shift as Master Control Aide was busy with several bookings in the intake/booking room (Doc. 46-13, Schonscheck Dep. 35), but Schonscheck described it as business as usual. He spent time observing the intake/booking room by camera. (Doc. 44, ¶ 10.) Around 10:30 p.m. on May 27, 2012, Schonscheck observed a fight in one of the pods via camera and an officer came to the control room to brief him on the incident shortly after midnight so that he could record it in the security log. (Doc. 44, Schonscheck Decl. ¶ 11.) In addition, an inmate in a special needs cell next to Clark's special needs cell was undergoing heroin withdrawal, repeatedly turning on the shower in her cell and using the intercom repeatedly, causing the monitor in the Master Control Center to display that cell and caused the Master Control Aide to respond to the inmate. (Doc. 46-13, Schonscheck Dep., 23-24; Doc. 44, ¶ 12.)

Schonscheck does not recall observing Clark displayed on any of the four-screen monitors in his special needs cell in the time immediately preceding his suicide attempt. (Doc. 44, ¶ 13.) A Wisconsin Administrative Rule provides that prisoners in county jails should be observed every hour at irregular intervals. Wis. Admin. Rule DOC § 350.18(1)(a) (Aug. 2014). Schonscheck had been trained, relative to monitoring inmates' activities on camera, to flip through all of the cameras every fifteen minutes, except when he was required to focus on the booking area during the arrival of a new inmate. (Doc. 46-13, Schonscheck Dep. 15-16.) Walker testified that during his shift on May 27-28, 2012, his attention was focused on booking and the inmate going through heroin detoxification, that he was unaware that Clark was suicidal, and that his lack of observation of Clark for 20 minutes or more was not acceptable job performance. (Doc. 46-13, Schonscheck Dep. 26-29.)

On May 28, 2012, Pflum was assigned to the floor officer post at the Jail. (Doc. 46-9.) During Clark's incarceration at the Jail in May 2012, she was aware that medical staff had assigned Clark to the special needs cell for possible alcohol withdrawal and had not placed Clark on suicide watch. (Doc. 46-13, Schonscheck Dep. Ex. 21 at 15.) During a security check, Pflum observed Clark's cell at 12:50 a.m. on May 28, 2012. (*Id.* at 10.) Approximately five minutes later, at 12:55 a.m., Clark hanged himself in his cell. (*Id.* at 11.)

The video from the security camera shows that on May 28, 2012, at approximately 12:25 a.m., Clark stood in front of furniture in his cell, trying to attach a piece of fabric to it. (Doc. 59, ¶ 19.) This activity continued on and off for approximately eight minutes. (Doc. 1, ¶ 456; Doc. 59, Decl. ¶ 20.) At approximately 12:53 a.m., Clark lifted the bedroll from his bed and carried it to the other side of a little wall that divided the sleeping part of the cell from the toilet area of the cell. (Doc. 1, ¶ 464; Doc. 59, ¶ 27.) One minute later, in full view of the security camera, Clark hefted the bedroll, bent over it, and appeared to be checking the strength of knots in the fabric holding the mattress in a roll. (Doc. 1, ¶ 465; Doc. 59, ¶ 28.) He then tied fabric that was attached to the bedroll around his neck. (Doc. 1, ¶ 466; Doc. 59, ¶ 29.) Facing the security camera, Clark stood with his back to the little wall, lifted the bedroll over his head, looped the fabric around his neck and eased the bedroll over the little wall. (Doc. 1, ¶ 467; Doc. 59, ¶ 30.) Video from the security camera shows that at approximately 12:55 Clark was standing, leaned back with his head and neck resting on the little wall, fabric around his neck tied to the bedroll which had been thrown over the wall, his legs out straight, feet apart. (Doc. 1, ¶ 468; Doc. 59, ¶ 31.) Shortly thereafter, Clark sagged into a semi-sitting position, legs still out. (Doc. 1, ¶ 469; Doc. 59, ¶ 33.) For a moment, Clark's hands went up toward his throat; then they dropped to his sides. (Doc. 1, ¶ 471;

17

Doc. 59, ¶ 34.)  Clark sagged further, while sitting on the floor, with his head drooped forward causing the bedroll to lift toward the top of the little wall.  (Doc.59, ¶ 35.)  After approximately 12:56:25 a.m., there was no further movement.  (Doc. 1, ¶ 473; Doc. 59, ¶ 36.)

At approximately 1:45 a.m., Pflum made her regular hourly rounds starting in the special needs cell area and discovered Clark.  (Doc. 46-9.)  Pflum summoned help and attempted to revive Clark.  (*Id*.)  Clark was transported to the emergency room at Berlin Memorial Hospital and airlifted to Theda Clark Hospital where he was pronounced dead at 8:58 p.m. on May 28, 2012.  (Doc. 46-14.)  The Mortality Review of Clark's successful suicide was completed by Kuehn, and those who participated in the critical review were Lueptow and Jail Lieutenant Joel Gerth — no physician and no psychiatrist.  (Doc. 46-2, Kuehn Dep. 145-146; Doc. 94-9.)  Although Clark died on May 28, 2012, Dr. Romana of HPL/CHC did not sign Kuehn's problem oriented record alcohol withdrawal until sometime in July of 2012.  (Doc. 94-7.)

For purposes of this decision, it is agreed that the Wisconsin Administrative Code LES (Law Enforcement Standards) requires that jail correctional officers receive training in, among other things: how to receive inmates into custody, how to supervise inmates, how to supervise special inmates, and how to assist the jail health care program.  (LES ¶ 304(1).)  To become a certified correctional officer in a jail, a recruit must successfully complete a minimum of 120 hours of training within his or her probationary period in subjects addressed in LES ¶ 304(1). (LES ¶ 301(2).)  Walker, a certified corrections officer, completed a seven-week training program.  (Doc. 46-11, Walker Dep. 9.)  Prior to working

as an officer at the Jail, he was employed as a corrections officer by the Wisconsin Department of Corrections for 3 ½ years.  (Doc. 46-11, Walker Dep. 5.)

Walker testified that he would want to know if any inmate was receiving mental health treatment in determining suicide risk.  (Doc. 46-11, Walker Dep. 31.)  In his deposition, Walker further stated that he would hand intake forms, including the suicide risk assessment, to the nurse.  (Doc. 46-11, Walker Dep. 26.)  He acknowledged that Ryan's actions at 12:32 a.m. (which he described as Ryan placing a shirt over the T.V.), at 12:38 a.m. (where Ryan was rolling up his mattress), at 12:39 a.m. (when Ryan was tying his bedroll with strips of fabric) would arouse his curiosity or concern to the point where he would have continued to observe.  (Doc. 46-13, Schonscheck Dep. 43, 44.)  Also, Schonscheck said upon seeing the activity that occurred at 12:53 a.m., that when Clark picked up the bed roll and carried it away from his bunk, he would have been concerned and would have immediately alerted an officer to check what was happening.  (Doc. 46-13, Schonscheck Dep. 48.)  Regarding the remainder of Clark's preparations, Schonscheck said—he would have requested officer assistance immediately, and that an officer would have been at Clark's cell within 30 seconds to a minute.   (Doc. 46-13, Schonscheck Dep. 49-50, 53.) Clark's cell, Special Needs One, could have been brought up on Schonscheck's monitor at any time had he chosen to do so.  (Doc. 46-13, Schonscheck Dep. 55.)

## CONCLUSIONS OF LAW

The court begins with the arguments of the Jail officers, Walker and Schonscheck, regarding qualified immunity.  Whether a defendant receives qualified immunity turns on a two-part analysis:  (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right; and

19

(2) if so, whether the right was clearly established at the time of its alleged violation. *Becker v. Elfreich*, 2016 WL 2754023, at *3 (7th Cir. May 12, 2016)(quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Although *Saucier* required that the questions to be addressed in the order stated above, the United States Supreme Court retreated from that analysis in *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 565 (2009), and now allows the court to address either question first. A negative answer to either one is enough to establish the defense of qualified immunity. *Id.,* 555 U.S. at 236. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd,* 563 U.S. 731, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011).

"To be clearly established a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. ___, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012). Whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 202. Hence, it is "critical to find the correct level of specificity." *Miller v. Harbaugh*, 698 F. 3d 956, 962 (7th Cir. 2012).

The United States Supreme Court has "repeatedly told courts . . . . not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 309, 193 L. Ed. 2d 255 (2015)(quoting *al-Kidd*, 131 S. Ct. at 2074). The qualified immunity defense in *Mullenix* concerned a police officer who shot and killed a suspect in a high speed chase after the suspect threatened to shoot the officers. *Id.*, 136 S. Ct. at 306-07. The United States Supreme Court rejected as too broad the Fifth Circuit's holding that the officer had violated the clearly established rule that a police officer may not use deadly force

20

against a fleeing felon who does not pose a sufficient threat to the officer or others. *Id.*, 135 S. Ct. at 308-309. Rather, an appropriate inquiry took into account a more specific definition of the right such as the officer confronted a "reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road." *Id.*, 136 S. Ct. at 310.

In another case decided last year, the United States Supreme Court in *Taylor v. Barkes*, ___ U.S. ___, 135 S. Ct. 2042, 192 L. Ed. 2d 78 (2015), addressed qualified immunity in a suit brought by the survivors of an inmate who committed suicide. The inmate had arrived at the facility and the nurse conducting the evaluation did not activate any special suicide prevention measures. The plaintiffs claimed that the warden violated the Eighth Amendment by "failing to supervise and monitor the private contractor that provided the medical treatment — including the intake screening — at the institution." *Id.*, 135 S. Ct. at 2043. The Supreme Court found no decision of the Court that "even discusses suicide screening or prevention protocols," the Third Circuit did not clearly recognize such a right, and the other circuits had "generally suggested that such a right did not exist." *Id.,* 135 S. Ct. at 2044-45. Therefore, even if shortcomings existed, there was "no precedent on the books . . . . would have made clear to petitioners that they were overseeing a system that violated the Constitution." *Id.,* 135 S. Ct. at 2045.

Yet the Seventh Circuit Court of Appeals has previously held that the right to be free from deliberate indifference to suicide was clearly established prior to a 1998 suicide attempt. *Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir. 2003) (citing *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir.1992)). Steven Cavalieri, a detainee who had been arrested for

kidnapping following a three-hour standoff with police, attempted suicide in a holding cell before his request to see a mental health advisor could be granted. The attempt left him in a permanent vegetative state. *Id.*, 321 F.3d at 620. During and after a standoff, Cavalieri's mother advised the officers multiple times that her son was suicidal, had been on suicide watch the month before, and needed to go to the hospital and/or see a counselor. *Id.,* 321 F.3d at 618-19. Cavalieri's ex-girlfriend, who was the subject of the kidnapping, told officers that he had threatened to kill himself during the incident and if he ever returned to jail. *Id.* In defining the right as the right to be free from deliberate indifference to suicide, the Seventh Circuit focused on what an officer should do in the face of the knowledge of a life-threatening situation, as well as his failure to mention that Cavalieri was a suicide risk and that the jail itself had recognized that risk a month earlier. 623. In the dissent, Judge Manion agreed that there was clearly established law that an officer on duty could not act with deliberate indifference toward a pretrial detainee whom the officer believed was a substantial suicide risk, but the officer is only required to act reasonably. However, Judge Manion found, that the officer took reasonable actions in the case and was, at most, negligent. *Id.*, 321 F. 3d at 627.

Against this backdrop, the parties disagree how the constitutional right should be characterized. The Green Lake defendants suggest that framing the question as the right to be free from deliberate indifference may be too broad after the most recent Supreme Court cases and find *Taylor* to be "more instructive" as it presented facts "nearly identical to the facts in the instant case." (Doc. 47 at 12.) Meanwhile, plaintiff asserts that there is no challenge to the suicide protocols and that the Green Lake defendants were deliberately indifferent to the risk of suicide in violation of the Eighth Amendment. Further, plaintiff

22

argues that the analysis in *Taylor* did not alter the parameters of the qualified immunity inquiry but the "per curiam decision simply held that the right of an inmate to receive an adequate suicide assessment was not clearly established in the Third Circuit at the time of the alleged offense in that case." (Doc. 61.)

Plaintiff's position is somewhat confusing in that it argues that this is not a case about the right to an adequate suicide assessment. At the same time, plaintiff contends that Walker performed none of the procedures required by the Green Lake County Jail Suicide Prevention policy after assessing Clark to be a maximum risk. For example, plaintiff asserts that Walker should have reviewed Clark's previous jail record, placed him on suicide watch (the policy states that the prisoner "shall be placed on 'Special Watch'" status in a Special Needs Cell, if one is available), referred him to mental health staff and initiated a more in-depth analysis. According to plaintiff, if Walker had placed Clark into a suicide prevention cell, he would have been dressed in a suicide gown, placed on video observation with personal observation every fifteen minutes, and would have been "far more protected" against his suicidal impulses. These arguments strike close to the right defined in *Taylor* "as the right of the proper implementation of adequate suicide prevention protocols." If the court were to conclude that *Taylor* was squarely on point, it would necessarily conclude that no decision of the Supreme Court established the right to proper implementation of suicide screening or prevention protocols at the time of Clark's death.

On the other hand, this court cannot disregard *Cavalieri*, the law of this circuit, that recognizes a more general, but clearly established, right to be free from the deliberate indifference to the risk of suicide. Holding plaintiff to its representation that it is not

contesting the proper implementation of any policy or procedure, the court will proceed with Eighth Amendment analysis.

Plaintiff's Eighth Amendment claim has an objective and a subjective component, that is the inmate must have an objectively serious medical condition and the defendant must be subjectively aware of and consciously disregard the inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *see also Townsend v. Cooper*, 759 F3d 678, 689 (7th Cir. 2014). The objective component is met because "it goes without saying that suicide is a serious harm." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)(quoting *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006)).

When the harm at issue is a suicide, the second—subjective—component requires a dual showing that defendant (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk. *Collins*, 462 F.3d at 761*; see also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir.2000) (defendant must be aware of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing the act). Under the first requirement, "the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life." The Supreme Court and the Seventh Circuit have held that "[i]f the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant official had actual knowledge of the risk." *Sanville v. McCaughtry*, 266 F.3d 724, 737 (quoting *Farmer*, 511 U.S. at 842, 114 S. Ct. 1970).

24

Taken in the light most favorable to the plaintiff, there is sufficient evidence that Walker knew that Clark was a suicide risk after conducting the health assessment, security assessment, and suicide assessment on May 23, 2012. Thus, even though Walker testified that he did not believe that Clark was suicidal, Clark told Walker he was not contemplating suicide, and Clark gave no indications that he would commit suicide, the facts, when taken in the light most favorable to the plaintiff, establish that Walker was aware that Clark was a risk. However, plaintiff concedes that Schonscheck was not aware that Clark was at risk of committing suicide.

Thus, the question is whether Walker was deliberately indifferent to the risk of suicide. This requires a showing of "more than mere or gross negligence, but less than the purposeful or knowing infliction of harm." *Collins,* 462 F.3d at 762. The Seventh Circuit has characterized the required showing as "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992). A defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] . . . . his action must be reckless before § 1983 liability can be found." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003).

Walker conducted a suicide assessment upon Clark's arrival at the facility. The risk assessment questions noted that Clark appeared to be under the influence of alcohol (.27 at the time of arrest), had received psychiatric care or hospitalization in a mental institution, had contemplated suicide in 2005 by cutting his arm and had a cousin who committed suicide. (Doc. 46, Ex. G.) Plaintiff maintains that Walker "fell down on the job" in failing "to respond in any way at all to the assessment that showed Clark to be at maximum risk of

25

committing suicide" and in failing to take any actions required by the Green Lake County Jail policy and procedure. (Doc. 61 at 5.)

Taking the facts in the light most favorable to the plaintiff, Walker conducted the assessment but told no one that Clark should be considered a maximum risk. Walker appears to shift responsibility for Clark's placement or care to Kuehn; however, Jail policy refers to the actions of correctional staff, and the Jail Administrator testified that the correctional officer is required to conduct an in-depth suicide screening. Moreover, paragraph 1.11 of the Green Lake contract for medical care of inmates provides that HPL shall not be responsible for the provision or cost of any mental health services and that the county shall be responsible for mental health services.

The analysis is different for Schonscheck, who had no knowledge that Clark was considered at risk for suicide. At the time of the suicide, Schonscheck was on duty as the Master Control Aide and, at best, was informed that Clark had "special medical needs, specifically possible withdrawal from alcohol." (Doc. 13.) Therefore, plaintiff appears to be proceeding on a theory that Schonscheck was deliberately indifferent to Clark's serious medical need of alcohol withdrawal. This theory is new, inasmuch as the first amended complaint asserts that the individual defendants are "responsible for having failed to protect Mr. Clark while he was in their care and/or custody from his known propensity to commit suicide, in violation of Mr. Clark's right to be free from cruel and unusual punishment, guaranteed by the Eighth Amendment to the United States" and that the individual defendants were deliberately indifferent to known serious medical needs thereby allowing Clark to commit suicide in their care and/or custody. (Doc. 76, ¶¶ 502, 503.) Hence, it

appears that plaintiff is attempting to hold Schonscheck liable for the suicide when he was not aware of a substantial risk of suicide.

Assuming for the sake of argument that plaintiff had raised and established that Clark's alcohol withdrawal constituted a substantial risk of serious harm, the plaintiff has established nothing more than Schonscheck subjectively knew that medical staff placed Clark into the Jail's special needs cell because he was suffering from possible alcohol withdrawal. Clark had arrived at the facility five days prior to the events in question. Pflum, a sergeant, was monitoring Clark on an hourly basis. Schonscheck testified that he remembered seeing Clark at 10:30 p.m. At 12:50 a.m., Pflum looked into Clark's cell and continued on her rounds. Clark did not move after 12:56 a.m. Even in the light most favorable to the plaintiff, Schonscheck may have been negligent but under the Eighth Amendment standards plaintiff has not established that Schonscheck had any reason to believe that Clark required frequent, intensive monitoring or that Pflum's rounds would be insufficient for the purpose of observing Clark. It is where an officer observes or is told the detainee is likely to commit suicide and yet does nothing that the officer has "gone beyond mere negligence and entered the territory of the deliberately indifferent." *Miller v. Harbaugh*, 698 F.3d 956, 963 (7th Cir. 2012).

Unlike Walker and Shonscheck, Kuehn worked for a private corporation. She argues that she is entitled to the defense of qualified immunity alongside these officers because she provided a specialized service (nursing) for the Green Lake defendants and is facing liability for "essentially the same conduct." In making her argument, Kuehn cites *Filarsky v. Delia*, where the United States Supreme Court ruled that a private lawyer retained to work with government employees conducting an internal affairs investigation was protected by

27

qualified immunity even though he did not work for the government on a permanent or full-time basis. *Filarsky v. Delia,* 132 S. Ct. 1657, 1665-66, 182 L. Ed. 2d 662 (2012) ("It is often when there is particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals.") However, Justice Sotomayor, in her concurring opinion, wrote that it "does not follow that *every* private individual who works for the government in some capacity necessarily may claim qualified immunity when sued under 42 U.S.C. § 1983. Such individuals must satisfy our usual test for conferring immunity. As the Court explains, that test 'look[s] to the general principles of tort immunities and defenses' applicable at common law, and the reasons we have afforded protection from suit under § 1983." 132 S. Ct. at 1669.

After *Filarsky* was decided, the Sixth Circuit Court of Appeals held that a psychiatrist, employed by a non-profit entity providing crisis counseling and mental health assessments for inmates, was not entitled to invoke qualified immunity. *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012). The Sixth Circuit cited *Filarsky* as defining the scope of the relevant inquiry: "whether a person in the same position as the party asserting qualified immunity would have been immune from liability under the common law of the late Nineteenth Century." *Id.*, 693 F.3d at 702. After reviewing cases, the court concluded that there was no common law tradition of immunity for a private doctor working for a public institution when Congress passed § 1983. *Id.* Further, the policy element of the immunity analysis hinges on three of § 1983's goals: promoting independent decision making, encouraging people to go into public service, and guarding against the "distractions from job duties that lawsuits inevitably create." *Id.* (citing *Richardson v. McKnight,* 521 U.S. 399, 411, 117 S. Ct. 2100, 138 L. Ed.

28

2d 540 (1997)).  Even though the psychiatrist in *McCullum* had once worked for the prison, the Sixth Circuit concluded that immunity would not be appropriate in that case and that the policies did not justify creating an immunity unknown to common law.  *Id.*

The Seventh Circuit has found the Sixth Circuit's reasoning in *McCullum* to be persuasive.  In *Currie v. Chhabra*, 728 F.3d 626 (7th Cir. 2013), two of the defendants—a doctor and nurse employed by Health Professionals, Ltd.—invoked the doctrine of qualified immunity.  The Seventh Circuit commented on the lack of clarity in the case law as to whether "qualified immunity is *ever* available to private medical care providers like the defendants."  *Id.,* 728 F.3d at 631.  In discussing the availability of the defense, the court addressed *Filarsky:*

> The Supreme Court recently considered the question whether "an individual hired by the government to do its work is prohibited from seeking [absolute or qualified] immunity, solely because he works for the government on something other than a permanent or full-time basis." *Filarsky v. Delia*, ___ U. S. ___, 132 S. Ct. 1657, 1660, 182 L. Ed. 2d 662 (2012). It held that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." *Id.* at 1665.  On the other hand, the *Filarsky* Court reaffirmed the holding of Richardson categorically rejecting immunity for the private prison employees there; in so doing, the Court emphasized that the incentives of the private market suffice to protect employees when "a private firm, systematically organized to assume a major  lengthy administrative task . . . or profit and potentially in competition with other firms," assumes responsibility for managing an institution.  132 S. Ct. at 1667 (quoting *Richardson*, 521 U.S. at 413, 117 S. Ct. 2100).

*Id.*, 728 F.3d at 631-632.  The Seventh Circuit discussed the Sixth Circuit's "detailed opinion tracking *Filarsky*," but declined to "definitely decide the issue" because the defendants violated clearly settled Fourth Amendment law when the prisoner collapsed and died in his cell as a result of a condition associated with untreated Type 1 diabetes.  *Id.*

29

Kuehn dismisses *Currie* as dicta and urges the court to follow *Filarsky*. However, there is little support in the briefs or record that would allow this court to conclude that Kuehn is identical to the private attorney in *Filarsky* who worked with government employees on an internal affairs investigation of a city firefighter. Kuehn does not address the common law or policies underlying the immunity defense as set forth by the Supreme Court and suggests that she is entitled to the defense because she performed a specialized service and worked closely with the defendants. However, that argument sounds more like the psychiatrist in *McCullum*. In light of the discussion in *Currie* and the cautionary language in the *Filarsky* opinion, the court is not satisfied that the immunity defense automatically extends to Kuehn simply because her employer had a contract with Green Lake.

That said, the court will assume for the sake of resolving these motions, that the immunity defense may be available to Kuehn. Similar to the approach taken by the Green Lake defendants, Kuehn asserts that there is no constitutional duty to contact area healthcare providers and family to determine whether Clark had a valid prescription, obtain the medication, and administer the medication. However, there is a constitutional duty to provide adequate medical treatment to those in custody. Even plaintiff concedes that the risk of suicide is a serious medical condition or harm. Therefore, officials must take reasonable preventative steps when they are aware that there is a substantial risk that an inmate may attempt to take his own life. *Estate of Cole v. Fromm*, 94 F.3d 254, 259 (7th Cir.1996) (holding that defendant prison officials "may be liable for [an inmate's] suicide if they were deliberately indifferent to a substantial suicide risk"); *see also Collignon v. Milwaukee County*, 163 F.3d 982, 990 (7th Cir.1998). Also, the court rejects Kuehn's

30

argument that this case is "very similar" to *Taylor* as discussed above. The plaintiff vehemently denies pursuing any claim that Clark had a constitutional right to a suicide risk assessment, but rather is proceeding on the theory that the defendants were deliberately indifferent to an inmate who is determined to be a maximum risk for suicide.

To this end, Kuehn admits that "Clark exhibited some suicide risk factors—he had a history of inpatient mental health treatment in the distant past, a suicide attempt seven years prior, and reported that an extended family member either attempted or committed suicide." (Doc. 71 at 12.) However, she insists that there is no evidence that Clark ever communicated suicidal ideation or intent, made a written or verbal request for medical or mental healthcare in the five days in the jail, or that he did anything out of the ordinary until the minutes before he committed suicide. Moreover, she placed Clark in a medical watch cell where he could be observed by a camera and was regularly observed by guards.

The record is replete with questions of fact that preclude summary judgment with respect to Kuehn. First, there are inconsistencies regarding who was responsible for the placement and protection after Clark was determined to be a maximum suicide risk on the Spillman Assessment. The contract between Green Lake and HPL/CHC states that HPL/CHC did not provide mental health services. However, Kuehn knew Clark from prior incarcerations and had assessed him as suffering from depression and alcoholism in January of 2012. His antidepressants were continued in the past, and just five months before the suicide Clark was seen by mental health workers on seven occasions. Also, there is evidence that CHC had policies governing suicide assessments but it is unclear whether the nurse should have disregarded any such policy because the Jail did not contract for mental health services. Second, Kuehn testified that she placed the results of

31

the assessment in Clark's medical file during the May 23, 2012, admission and then wrote "meds—can't remember name, but [no] current script, [not on trazadone as previous stay]." After that, no action was taken with respect to the red flags regarding mental health. There is no evidence that she attempted to ascertain the name of his current prescription, physician, or otherwise consulted the on-call nurse or doctor before proceeding with medication she felt appropriate. Third, there are conflicts with her testimony. While she testified that Lueptow had told her a special needs cell was monitored continuously, Lueptow denies making such statement. Finally, she started the alcohol withdrawal protocol with no input or authorization from any doctor and defended the decision by suggesting Clark could not take an antidepressant while on the protocol. Plaintiff appears to have experts lined up to testify that would suggest otherwise. Whether the testimony of these experts would withstand a supported objection by defendants or would otherwise demonstrate that Kuehn's conduct was something other than mere negligence remains to be seen. However, at this stage the court must take the evidence in the light most favorable to the plaintiff, and that evidence suggests that Kuehn may have acted with deliberate indifference to Clark's risk of suicide.

The analysis for CHC and HPL is slightly different because the plaintiff has asserted respondeat superior, as well as a *Monell* claim. *See generally Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). The Seventh Circuit has indicated that "there are powerful reasons" to say that *Monell* should not apply; however, "[for now], this circuit's case law still extends *Monell* from municipalities to private corporations." *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 794 (7th Cir. 2014). On the other hand, a private corporation is not vicariously liable under § 1983 for its

32

employee's deprivations of other's civil rights. *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *see also Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014)(indicating that the court would reject plaintiff's arguments regarding respondeat superior because the plaintiffs failed to point to any intervening on-point Supreme Court case that would permit the court to overrule the prior cases). Hence, to recover against CHC and HPL on the *Monell* claim, plaintiff must offer evidence that the injury was caused by a policy, custom or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Shields*, 746 F.3d at 796.

The facts of this case do not establish that CHC and/or HPL maintained a custom, policy or practice evincing deliberate indifference to the risk of suicide resulting in harm to Clark. As stated above, these corporate healthcare providers did not contract with the County to provide mental health services. Further, plaintiff relies entirely on Kuehn's testimony. There must be a pattern or series of violations presented to lay the premise of deliberate indifference. *See Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003). No one but Kuehn testified that CHC allowed nurses to act outside their licensing authority to prescribe medication without a doctor's order. Even Kuehn admitted that she would contact the on-call nurse who would contact the doctor regarding protocol implementation, but she could not remember what she did in this case. Kuehn does not appear to have had any policymaking authority that could be attributed to the corporation. Ultimately, this is not the "pattern or series of incidents of unconstitutional conduct" required in the absence of an explicit policy. *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir.1993) . Now, therefore,

33

IT IS ORDERED that defendant Bruce Walker's motion for summary judgment is denied.

IT IS FURTHER ORDERED that Stephen Schonscheck's motion for summary judgment is granted based on qualified immunity.

IT IS FURTHER ORDERED that defendant County of Green Lake remains as a defendant in this case.

IT IS FURTHER ORDERED that Kuehn's motion for summary judgment is denied.

IT IS FURTHER ORDERED that Correctional Healthcare Companies Inc. and Health Professionals Ltd.'s motion for summary judgment is granted. Correctional Healthcare Companies and Health Professionals Limited are dismissed.

IT IS FURTHER ORDERED that a status conference is scheduled for November 2, 2016, at 2:00 P.M. in Courtroom 222.

Dated at Milwaukee, Wisconsin, this 12th day of September, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE

34