# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF RYAN L. CLARK,
          **Plaintiff,**

    **v.**                                     **Case No. 14-C-1402**

COUNTY OF GREEN LAKE, et al.,
          **Defendants.**

---

## DECISION AND ORDER

On May 28, 2012, Ryan Clark committed suicide while incarcerated in the Green Lake County Jail. His estate filed this lawsuit, alleging Eighth Amendment and state tort law violations by several individual defendants and by the corporate healthcare providers with which Green Lake County had contracted to provide healthcare for inmates at the Jail. Plaintiff subsequently amended the complaint to include a claim under *Monell v. Department of Social* Services, 436 U.S. 658 (1978) against the County. The healthcare provider and certain of the individual defendants have since been granted summary judgment. Before me now are cross-motions for summary judgment on the *Monell* claim against the County.

Motions for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir.1997). In determining whether to grant a motion for summary judgment, I consider the evidence presented in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255

(1986). When the record, taken as a whole, could not lead a rational jury to find for the non-moving party, there is no genuine issue and no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether there is a genuine dispute as to a material fact, I use this court's local rules regarding summary-judgment procedure. *See* Civil L.R. 56(b) (E.D. Wis. 2010, rev. 2015). Under this procedure, the moving party submits a statement of proposed material facts as to which the moving party contends there is no genuine issue. Civil L.R. 56(b)(1)(C). This statement must contain specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon to support the proposed facts. *Id.* The party opposing summary judgment must respond to each proposed fact and, for those facts that the party denies, must specifically reference the affidavits, declarations, parts of the record, and other supporting materials that support the non-movant's position. Civil L.R. 56(b)(2)(B)(i). The party opposing summary judgment may file its own statement of additional facts that support the denial of summary judgment. Civil L.R. 56(b)(2)(B)(ii). The moving party must respond to the non-movant's proposed additional facts and must cite any parts of the record relied upon. Civil L.R. 56(b)(3)(B). Any uncontroverted statements of fact are deemed admitted for purposes of summary judgment. Civil L.R. 56(b)(4).

I.      FACTS

The following summation of the facts draws from the parties' submissions with respect to both Plaintiff's and Green Lake County's motions for summary judgment. *Green Lake County's Suicide Prevention Policies and Practices*

Green Lake County ("County") is a municipal corporation organized under the laws of the State of Wisconsin. From January 1, 2008, through December 31, 2012, the County contracted with Health Professionals Limited ("HPL") to provide healthcare for inmates at the Green Lake County Jail ("Jail"). ECF No. 194, ¶ 1. HPL was taken over by Correctional Healthcare Companies ("CHC"). *Id.*, ¶ 2. CHC is a private, for-profit company whose function was to provide medical care for inmates in county jails. *Id.*, ¶ 3.

The contract between the County and HPL that was originally to be in effect from January 1, 2008 to December 31, 2010, provided:

> MENTAL HEALTH. HPL shall provide and bear the cost of mental health services as outlined in Paragraph I(BX3). Mental Health services shall include intake, post admission evaluation, counseling and suicide prevention.

*Id.*, ¶ 20. However, a new contract between the County and HPL was negotiated and took effect on August 1, 2010. *Id.,* ¶ 21. It provided, in part:

> MENTAL HEALTH. HPL shall not be responsible for the provision or cost of any mental health services.

*Id.* At roughly the same time, the County funded two limited-term employment positions through the County's Department of Health and Human Services to provide mental health services, which included coverage of crisis incidents, mental health consultation, alcohol and drug abuse services and therapy dogs. ECF No. 184, ¶¶ 15, 17-18.

Then, in July, 2011, yet another contract took effect between the County and HPL. ECF No. 194, ¶ 22. It provided, in relevant part:

> MENTAL HEALTH NOT COVERED. HPL shall not be responsible for the provision or cost of any mental health services. The COUNTY shall be responsible for the provision or cost of mental health services for the JAIL POPULATION.

3

*Id.* This contract remained in effect through December 31, 2012. *Id.* Meanwhile, in August 2011, the County extended funding of the Department of Health and Human Services provision of jail mental health services for another year.

The Green Lake County Sheriff's Department promulgated jail policies and standard operating procedures, which correctional officers were trained to follow. *Id.*, ¶ 25. Green Lake County Sheriff's Office Standard Operating Procedure No. 408.1.1, effective June 9, 2010, and still in effect at the time Ryan Clark committed suicide read in part:

> HPL has agreed to be responsible for the medical, mental health and dental needs of inmates twenty-four hours a day by providing on call physicians.

*Id.*, ¶ 23. This Standard Operating Procedure was not updated to reflect the fact that in 2011 and 2012, the County did not have a contract with HPL for the provision of mental health services. *Id.*, ¶ 24.

The booking process at the jail begins when an individual is dropped off at the jail. ECF # 191, ¶ 1. The individual is patted down and dressed in jail clothing. *Id.* He has his fingerprints and photograph taken and the intake officer asks him various questions needed for intake. *Id.* at ¶ 2. This includes a suicide prevention screening test, described in more detail below. After intake is completed, the inmate is placed in a holding cell adjacent to the jail intake area to await medical clearance by the jail nurse. *Id.* It is disputed what process is used if the jail nurse is not available. ECF No. 184, ¶ 32.

4

The Sheriff's Department has promulgated Standard Operating Procedure 406.2.1, which took effect on June 9, 2010, and which addresses suicide prevention at the jail. ECF # 46-8. This Procedure dictates that, as part of the intake process, "a Spillman Initial Inmate Assessment shall be completed on each inmate that is taken into custody." *Id.*, 2. A Spillman Initial Assessment Assessment is a computer software instrument which includes a security risk assessment, a health assessment, and a suicide risk assessment. ECF # 194, ¶ 29. The software specifies questions for the administering officer to ask the inmate, and the officer inputs the inmate's answers. *Id.*, ¶ 30. Based on these answers, the software generates a rating of the inmate's suicide risk, with a rating of "MAX" indicating maximum risk. *Id.*; ECF # 164-6 at 13: 16-18, 14:13-18; ECF # 191, ¶ 14. Standard Operating Procedure 406.2.1 also directs the intake officer to: observe the inmate for visual and verbal indicators of possible suicide risk; seek information from the arresting officer regarding whether the new inmate is a suicide risk; review paperwork completed by the arresting officer and other agencies and records from previous stays in the jail; and ask the inmate questions about any history of suicide attempts or present suicidal feelings. ECF # 46-8, 2-3.

If this basic intake process indicates that a new inmate may be a suicide risk, Standard Operating Procedure 406.2.1 indicates that "an in-depth suicide screening shall be completed to obtain more detailed information about the inmate's situation and his/her degree of risk." *Id.,* 3. Based on the information thus obtained, "an assessment will be made as to the degree of [the] inmate's suicide risk." *Id.* "If an inmate is assessed as a suicide risk, he/she shall be placed on 'Special Watch' status a Special Needs Cell, if available" (sic). *Id.*

5

There are three special needs cells in the Green Lake County Jail. ECF No. 194, ¶ 45. Two are medical special needs cells and one is a suicide prevention cell. *Id.* In the suicide prevention cell, the inmate can be observed more easily: the entire front wall is glass, and there is no privacy wall between the front of the cell and the toilet/shower area. *Id.*, ¶ 46. The suicide prevention cell also has no structures from which an inmate can hang himself. *Id.*, ¶ 47. Further, in May 2012, an inmate placed on suicide watch would have been subject both to video observation and, every 15 minutes, personal observation by the Jail's Master Control Aide; in addition, the inmate would be dressed in a suicide smock which cannot be used to fashion a noose. *Id.*, ¶ 48.

The language of Standard Operating Procedure 406.2.1 does not in itself make clear who is to conduct the in-depth assessment and make the determination whether to place the inmate on Special Watch status. However, in June 2010, when Procedure 406.2.1 became effective, the County's contract with HLP indicated that HLP staff would provide mental health services including "intake" and "suicide prevention." ECF # 194, ¶ 20. The language of Procedure 406.2.1 did not change when the contract between the County and HPL changed to the effect that HPL was no longer contractually responsible for mental health services.

Jail officers and administrators have provided inconsistent testimony about whether a max score on the computerized Spillman assessment automatically triggered a responsibility on the part of the intake officer to treat the inmate as at risk of suicide, or whether the Spillman score was simply a factor that the officer could consider at his discretion in forming an assessment of the inmate's suicide risk. ECF No. 184, ¶ 28. Sheriff Podoll testified that the intake officer was obligated to take follow-up measures if

6

the Spillman assessment indicated that an inmate was a maximum suicide risk. ECF No. 155, 40:10-19.[1] The County's designated Rule 30(b)(6) representative, Lori Evans, testified that under the Sheriff's Department policies in place between 2010 and 2012, if an inmate was rated a maximum risk for suicide on the Spillman assessment, the intake officer was to make a referral to HPL/CHC. ECF No. 194, ¶ 41; ECF No. 154, 82:15-24. Correctional officer Liz Pflum testified that the Spillman inventory was the "only assessment tool we have" for assessing suicide risk at intake, and that she did not recall being trained on using the other factors identified in SOP 406.2.1 to assess an inmate's suicide risk. ECF No. 164-5, 24-25. Correctional Officer Raymond Colhouer testified that as far as he knew, when an inmate scored max on the Spillman assessment, every intake officer would then take suicide precautions. ECF No. 164-6, 29:20-30:3. However, correctional officer Bruce Walker testified that in his experience with the Spillman assessment, whenever an inmate answered that he or she had been drinking alcohol, the computer program always rated the inmate a maximum suicide risk. ECF No 164-4 at 22-24; ECF No. 194, ¶ 31. For that reason, Walker did not regard the Spillman readout as controlling whether the inmate was to be treated as a suicide risk. *Id.*

---

[1] Q: If somebody is flagged as a maximum suicide risk by the intake Spillman booking assessment, are there mandatory things that the correctional officer must do, or does the correctional officer have discretion as to how to handle the inmate?
    A: No, there's guidelines.
    Q: And are the guidelines mandatory?
    A: There's guidelines that they need to follow.
    Q: Okay. So they're mandatory guidelines?
    A: Correct.
ECF # 155, 40:10-19.

The testimony is also at odds as to whether, after the contract with HPL was modified, the intake officer or the nurse who performed the medical clearance was responsible for conducting the in-depth assessment of an inmate who had been flagged through basic intake as a suicide risk and, if necessary, placing that inmate on suicide watch. ECF No. 184, ¶ 30. Jail Administrator DeAnna Lueptow, the jail's top officer who reports directly to the sheriff, testified that the policy required the intake officer to conduct the in-depth screening. ECF # 83, 100:5-20.[2] Lueptow also testified that the intake officer was responsible for the initial determination that an inmate should be placed on suicide watch, and that the nurse would be called upon to finalize the placement only after that initial determination had been made. ECF # 83, 38:5-39:23.[3]

---

[2] Q: On the next page, page 322, under B, suicide risk screening, the policy says that "if a basic intake indicates that a new inmate may be a suicide risk, an in-depth suicide screening shall be completed to obtain more detailed information about the inmates's situation and to better assess his or her degree of risk"?
A: Correct.
Q: That step is required, is it not?
A: Correct.
Q: Who is to do the—well, let me ask this first. So who is to do the in-depth suicide screening?
A: The officer.
Q: The correctional officer?
A: Correct.
ECF # 83, 100:5-20.

[3] Q: Was the nurse involved in the initial suicide risk assessment for every new inmate in 2012?
A: Not at the time they were happening if she wasn't on duty.
Q: That initially they would be done by correctional officers if the nurse was not on duty. If she were on duty, would she be involved?
A: Yes.
Q: On a routine basis?
A: Yes.
Q: So whether an inmate would be placed on suicide watch upon admission to the jail would be determined by the admitting correctional officer if the nurse were on duty and by the nurse if she were?
A: Correct. But there was always consultation with CHC by phone if the nurse wasn't on duty. Then we made a call to the triage nurse and then a determination was made for suicide watch.
…
Q: What would trigger such a call?
A: If someone was going to be placed on a suicide watch.
Q: So the call wasn't for the purpose of helping with the decision to place somebody on suicide watch. If the nurse wasn't on duty, that decision would be made entirely by the correctional staff?

On the other hand, Officer Pflum testified that the in-depth suicide screening referenced in the suicide prevention policy was to be completed by the contract health care provider. ECF No. 164-5, 21:10-16. Officer Walker testified that it was not his responsibility as an intake officer to conduct an in-depth suicide screening, and that he was not trained to do an in-depth screening. ECF No. 164-4, 36:1-5.

B.      *Ryan Clark's Intake and Suicide*

On February 24, 2009, Ryan Clark finished his term of confinement in state prison and was released to extended supervision. ECF No. 184, ¶ 39. During the next two years, he was admitted to the Green County Jail approximately eight times as a result of alleged infractions of the rules of his extended supervision. *Id.*, ¶ 40. On four of these occasions, the Spillman assessment conducted at intake indicated that Ryan Clark was a max risk for suicide. *Id.,* ¶¶ 43, 49, 55, 61. On each of these occasions, after performing the intake assessment, the intake officer placed Clark in a holding cell in the booking area of the jail to await medical screening by the jail nurse.[4] *Id.,* ¶¶ 44, 50, 56, 62. On two of these occasions, the nurse screened Clark and then assigned him to a medical special needs cell. ¶¶ 45-46, 57-58. On two of these occasions, the nurse screened Clark and then assigned him to general population. *Id.*, ¶¶ 51-52, 63-64.

---

A: No. They would call the triage nurse.
Q: I must have misunderstood. I thought that you were saying that that call would only be made if the decision had already been made to place somebody—
A: If they thought somebody needed to be on a suicide watch, they would call the triage nurse. They would give the nurse the information. Then a decision would be made.
Q: So a correctional officer could decide on his own to place somebody not on suicide watch, but would have to consult with CHC in order to place somebody on suicide watch?
A: Correct. Correct.
ECF # 83, 38:5-39:23.

[4] As discussed above, the parties dispute whether this screening included a suicide risk assessment.

Neither Clark nor anyone acting on his behalf ever notified the Jail staff or administrators of a problem with the suicide risk assessment or prevention protocols employed at any of these four episodes. *Id.,* ¶ 65.

On May 23, 2012, Clark was again admitted to the Green Lake County Jail for a violation of his extended supervision rules. ECF No. 194, ¶ 27. When he was admitted, a preliminary breath test revealed that Clark had a blood alcohol level of 0.27, more than three times the legal limit. ECF No. 184, ¶ 67. Defendant Bruce Walker acted as Intake Officer. ECF No. 194, ¶ 28. As part of the intake process, Walker administered the Spillman assessment. *Id.*, ¶ 29. The Spillman software rated Clark a maximum risk for suicide. *Id.,* ¶ 31. In addition, Clark told Walker that he was taking medication for depression but he could not remember its name; Clark was in fact taking a prescribed antidepressant called Citalopram. *Id.,* ¶¶32-33. After completing the intake assessment, Walker placed Clark in the holding cell adjacent to the intake area to await assessment by nurse Tina Kuehn, the HPL nurse on duty at that time. *Id.,* ¶ 34. Walker left Clark's paperwork, including the Spillman assessment, for Nurse Kuehn, and Kuehn placed it in Clark's medical chart. *Id.,* ¶ 42.

Nurse Kuehn did not refer Clark for mental health assessment, place Clark on suicide watch, or inform jail staff that Clark was presenting any risk of committing suicide. *Id.,* ¶ 43. She placed Clark in a medical special needs cell for alcohol detoxification, not the suicide prevention special needs cell. *Id.,* ¶ 44; ECF No. 184, ¶ 79. She also discontinued Clark's antidepressant. ECF No. 194*,* ¶49.

Clark committed suicide in the medical special needs cell on the night of May 27-28, 2012, using fabric to create a noose and hanging himself on the little wall that

divided the sleeping portion of the cell from the bathroom portion. *Id.*, ¶¶ 54-62. The video camera in Clark's cell recorded his suicide and shows that his preparations and death occurred over a period of roughly 30 minutes, from 12:25 to 12:56 am. *Id.,* ¶ 52. The officer monitoring the video cameras that were placed in the cells did not observe his preparations or death. *Id.* The officer did not observe Clark more often than he did because he was not aware that Clark was suicidal. *Id.,* ¶ 53.

    II.    DISCUSSION

      A.  Monell Liability

In *Monell*, the Supreme Court established that a municipality can be held liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers of by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." 436 U.S. at 694. Thus, the plaintiff seeking to establish *Monell* liability must first identify the municipal policy, custom, or practice that caused his injury. *Lapre v. City of Chicago,* No. 17-3024, slip op. at 8 (7th Cir. Dec. 17, 2018). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* at 8-9 (*quoting Board of County Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403-04 (1997)); *also see Monell*, 436 U.S. at 694 (municipal policy must be the 'moving force of the constitutional violation' in order to impose municipal liability). The Seventh Circuit recognizes three general categories of municipal conduct that can constitute a "policy" for *Monell* purposes: (1) an express policy, statement, ordinance or regulation that, when enforced, causes a constitutional deprivation; (2) an unconstitutional practice so permanent and well-settled as to

11

constitute a "custom or usage" with force of law; and (3) the decision of a municipal policymaker with final policymaking authority in the area at issue. *See McCormick v. City of Chi.,* 230 F.3d 319, 324 (7th Cir. 2000); *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005).

A policy "generally implies a course of action consciously chosen from among various alternatives." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *see also Pembauer v. Cincinnati*, 475 U.S. 469, 483-484 (1986) (Brennan, J., plurality). In other words, to establish municipal liability a plaintiff must show that the municipal action was taken with a "requisite degree of culpability." *Lapre, supra*, at 9; *Brown*, 520 U.S. at 404. When the challenged policy explicitly violates the Constitution when enforced (i.e. when the policy on its face directs municipal employees to violate the Constitution), it is possible to infer the requisite culpability from the municipality's enactment of the policy. *See Lapre*, *supra*, at 9. On the other hand, to demonstrate that a municipality acted culpably in permitting an unconstitutional custom or practice, or by failing to adequately train or supervise its agents, or by failing to create policy in an area where policy is needed to remedy a potentially dangerous practice, the plaintiff must show that the municipal policy makers were

> deliberately indifferent as to the known or obvious consequences. In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff.

*Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (internal citations omitted); *see also Calhoun*, 408 F.3d at 380. In such situations, a single incident of constitutional violation is insufficient to establish municipal liability, because

12

the single incident is not enough to show that the municipality was aware of the issue and failed to take action. *Calhoun,* 408 F.3d at 380. Without additional evidence, "the absence of a policy might…mean only that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action." *Id.* By far the most common and reliable means of establishing that a municipality's failure to intervene in a defective practice (or to adequately make policy or adequately train or supervise its employees) was the result of a conscious and therefore culpable municipal "choice" is to present evidence that the same problem has arisen many times, thus putting policy-makers on notice of the risk at issue. *Id.; Hahn v. Walsh*, 762 F.3d 617, 637 (2014); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir., 2012). However, proof of a series of incidents is not the *only* means of establishing the requisite municipal culpability: the Supreme Court has acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a "highly predictable consequence" of the municipality's failure to act. *See Board of County Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Woodward v. Correctional Medical Services*, 368 F.3d 917, 929 (7th Cir. 2004); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir., 1986) ("In situations that call for procedures, rules or regulations, the failure to make policy may itself be actionable."); *Armstrong v. Squadrito*, 152 F.3d 564, 578 (7th Cir. 1999)(where official possessed no actual knowledge of problems arising from lack of policy, plaintiff must establish that the policy ignores a plainly obvious danger); *Wells v. Bureau County*, 723 F.Supp.2d 1061,

1083 (C.D. Ill. 2010)("[O]bjective awareness can form the basis for municipal liability where a risk is obvious.").

In addition to culpability, municipal liability also requires a plaintiff to show a "direct causal link between the municipal action and the deprivation of federal rights." *Lapre, supra,* at 9. If the policy at issue on its face directs a municipal employee to violate the Constitution, the constitutional injury can be said to have been directly caused by the municipality. *Id., citing Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000). When the plaintiff proceeds on a custom or practice theory (which includes failure to train, supervise or make policy), the plaintiff must show that the custom or practice proximately caused the alleged unconstitutional conduct. *Sams v. City of Milwaukee, Wis.*, 117 F.3d 991 (7th Cir. 1997); *Estate of Novack,* 226 F.3d at 530; *Wells,* 723 F.Supp.2d at 1081. "It is when execution of an entity's custom inflicts the injury that the entity is responsible under § 1983." *Woodward*, 368 F.3d 917 (quoting *Monell,* 436 U.S. at 694).

### B.  Plaintiff's Motion for Summary Judgment

Plaintiff has moved for summary judgment on *Monell* liability, arguing that, taken together, the 2011 contract that Sheriff Podoll signed with HPL expressly absolving HPL of responsibility for mental health services for jail inmates and the Sheriff's Office Policy then in effect instructing staff that HPL would be responsible for mental health needs of inmates twenty-four hours a day constitute a policy that on its face violates the Constitution because the documents establish a complete deprivation of mental health care. Plaintiff argues:

> By removing mental health care from the HPL/CHC contract,
> the Sheriff ended the policy and practice that the contract

> nurses would continue to perform mental health care which included suicide prevention and suicide assessments at intake. By never changing the Jail's policy, which correctional officers were expected to know and follow, the Sheriff failed to shift the responsibility for suicide prevention at intake to his own employees or anyone else. By this conduct, he intentionally deprived a plaintiff of a federally protected right to be free from deliberate indifference to the serious risk of suicide, which necessarily establishes that the municipality acted culpably.

ECF No. 193 at 5-6 (internal citations omitted).

It is certainly possible that a jury could find from the evidence that the Sheriff acted with the requisite culpability in changing the HPL contract without changing the policy or the training his officers received. However, in assessing plaintiff's motion for summary judgment I am required to draw inferences and construe facts in favor of the defendants. Reading the facts through that lens, I find ample reason for a reasonable jury to conclude that the Sheriff acted with neither intent nor deliberate indifference in performing the conduct described above. It is true that the two documents taken together (and disregarding the circumstances and practices surrounding them) amount to a facial deprivation of mental health care. And it is true that when a municipal policy on its face directs an employee to violate the Constitution, courts may infer the required culpability from the municipality's enactment of the policy. *See Lapre*, *supra*, at 9. But because each document in the present case is not unconstitutional on its own, and because the documents were created at separate times, their facial unconstitutionality taken together does not on its own support an inference that either was created with the requisite unconstitutional intent. Certainly a *reasonable* sheriff, upon changing a contract with a jail health care provider to eliminate its responsibility for mental health

15

services at the jail, would have undertaken a review of the key mental health services needed at the jail and ensured that the jail's policies and procedures were sufficient to cover those services. But Sheriff Podoll's failure to undertake such a review suggests negligence, and not necessarily the "conscious disregard of known or obvious dangers" required to establish deliberate indifference in the context of municipal liability. See *Armstrong v. Squadrito*, 152 F.3d 564. A jury must decide whether Sheriff Podoll was objectively aware of the risk caused by the alteration of the HPL contract such that his failure to change the jail procedures or to train jail officers differently constituted deliberate indifference to that risk. *See Wells*, 723 F.Supp.2d at 1084.

### C. Green Lake County's Motion for Summary Judgment

I turn now to Green Lake County's motion for summary judgment, meaning that I will construe facts and draw inferences in favor of plaintiff.

Green Lake County first argues that because Clark's suicide was the only suicide in the jail in the last thirty years, the Estate cannot show that a pervasive municipal custom or practice was the "moving force" behind (i.e., the cause of) his constitutional injury. This argument is unavailing. The Estate has presented evidence that, on four occasions prior to the incarceration that ended in Clark's suicide: (1) a Spillman assessment at intake flagged Clark as a max risk of suicide; (2) the intake officer placed Clark in the booking cell to await screening by the nurse; and (3) the nurse subsequently released Clark into general population or a medical special needs cell. It is possible to infer from this evidence that the jail staff had a custom or practice of not initiating suicide prevention measures after the Spillman assessment had indicated that an inmate was at max risk of suicide. That these previous episodes did not result in

Clark's suicide is irrelevant to their validity as evidence of a widespread practice. That Walker's conduct at the intake stage of the incarceration that led to Clark's suicide shared the identified elements with the conduct of the intake officers at Clark's prior bookings supports an inference that this widespread practice was the moving force behind Walker's conduct. In addition, the confused responses of jail administrators and officers asked to describe the intake officer's responsibilities under the suicide screening policy and the role of the Spillman assessment in determining an inmate's suicide risk supports an inference that the Jail's failure to adequately train officers on suicide screening protocols was a moving force behind Walker's conduct after Clark's Spillman assessment indicated he was at max risk of suicide. Finally, the County argues that jail staff's practice of not initiating suicide prevention protocols after the Spillman assessment indicated a max risk was not a cause of constitutional injury to Clark because the staff relied on the nurse to conduct a suicide screening and make determinations about suicide prevention measures as part of the intake medical assessment. This court has already established that responsibility for the identification and care of inmates at risk of suicide cannot be shifted to HPL because the Jail's suicide screening policy referred to the actions of correctional staff and because HPL's contract provided that HPL would not be responsible for the provision or care of mental health services and that the County was responsible for such services. ECF No. 111 at 26.

The County next argues that because there had been no prior suicides in the Jail and no complaints about the Jail's suicide prevention protocols, the Estate cannot establish that County policymakers had notice that its practices with respect to suicide

prevention created a risk of harm to inmates. However, given County policymakers admitted awareness of the heightened risk of suicide among the inmate population and the concomitant need for robust intake screening procedures, a jury could reasonably find that Sheriff Podoll's alteration of the contract to absolve HPL of responsibility for suicide prevention screening should have put him on notice of a need to examine the Jail's practices and ensure that the gap thus created was filled. *See Armstrong*, 152 F.3d at 578. That the County department of Health and Human services was providing certain mental health services in HPL's place does not automatically absolve the County of a finding of deliberate indifference in this area, because intake screening is a specific and vital category of service that was identified in the original HPL contract and was not explicitly replaced.

The County argues that a claim that it acted with deliberate indifference with respect to the training of intake officers fails because all the officers had received instruction in suicide prevention protocols from the State. But the lack of training alleged here is specific to the institution: the Estate alleges that Green Lake County Jail officers were not trained on their responsibilities in an intake process shaped by the Jail's unique facilities and its unique relationships with its contracted health care provider and the County Department of Health and Human Services. I find no reason to think that County policymakers could reasonably have relied on the State training to address the training deficiencies alleged to have resulted in injury to Clark.

The County argues that there is no causal nexus between the Jail's suicide prevention protocol and Clark's suicide 5 days later. However, the evidence indicates that had Officer Walker placed Ryan Clark on suicide watch following intake, Clark

would have been observed at irregular intervals not exceeding fifteen minutes. On the night Ryan Clark committed suicide, his preparations took 30 minutes and went unobserved. That fact alone is sufficient to support a jury's finding of a causal nexus between the intake process and Clark's suicide. That identification as a suicide risk would also have resulted in Clark receiving counseling and likely continuation of his antidepressant medication only strengthens the link.

III.    CONCLUSION

For the reasons stated above, **IT IS ORDERED** that plaintiff's motion for partial summary judgment on *Monell* liability (ECF No. 165) is **DENIED.**

**IT IS FURTHER ORDERED** that defendant Green Lake County's motion for summary judgment on *Monell* liability (ECF No. 160) is **DENIED.**

Dated at Milwaukee, Wisconsin, this 21st day of December, 2018.


 s/Lynn Adelman
LYNN ADELMAN
DISTRICT JUDGE

19